MASSMAN CONSTRUCTION CO. v. CHISHOLM, Adm'r.

No. 30553. Nov. 30, 1943.

Rehearing Denied Feb. 1, 1944.

*145 P. 2d 207.*

Bridges, Parry & Krueger, of Tulsa, for plaintiff in error.

Earl Boyd Pierce and R. M. Mountcastle, both of Muskogee, and Harve N. Langley, of Pryor, for defendant in error.

DAVISON, J. This action for damages was instituted in the district court of Mayes county on the 1st day of April, 1940, by Donald Chisholm, administrator of the estate of Buck B. Bassham, against the Massman Construction Company, a corporation.

The plaintiff recovered judgment for the sum of $7,500 on trial of the cause to a jury on the theory that the defendant corporation was legally responsible for the death of Bassham.

In this appeal the defendant, as plain-

tiff in error, challenges the sufficiency of the evidence to support the verdict. In particular, one of its contentions is that the alleged employee and servant of the defendant corporation whose negligence is asserted to have caused the death of Bassham and for whose negligence the defendant is asserted to have been responsible, was not at the time of the fatal incident acting as an employee of the company and in the course or scope of his employment as such.

Our review of the evidence reflected by the record reveals that the contention is meritorious and of controlling importance in the disposition of this appeal.

In August of 1939 the defendant, Massman Construction Company, was engaged in construction work on the Grand River Dam. It employed on the project about 2,645 men, among whom were Charles Bridges, Walt deGraffenreid, Tom Baldwin, and the deceased, Buck B. Bassham, who are the principal characters in the tragedy out of which this litigation flows.

Charles Bridges was a "yard truck foreman" or yard foreman for the company. The other men above named were workmen who in the usual course of their employment worked under other divisional or departmental foremen of the company. Bassham usually drove a truck used in connection with the mixing of concrete. His foreman who had charge of the concrete mixer crew and concrete truck drivers was H. F. Peiffer. Walt deGraffenreid and Tom Baldwin were in the mechanical department and engaged in repairing trucks, automobiles, etc. Their foreman was Alex Fredrickson.

None of the three foremen above mentioned had or exercised any authority over either of the other two or over men being supervised by the other two, however from time to time when one foreman was not able to use some man or men on a particular day he would suggest that such employees interview another foreman with a view to working under him. In this manner men who normally worked under one of the foremen on occasion worked under a different foreman. The company sanctioned the practice by acquiescence.

Bearing in mind the general employment of the parties, let us turn our attention to matters more directly connected with the fatal occurrence.

Charles Bridges was the owner of a 1935 model tudor Ford automobile. He decided to install a rebuilt motor in it. He employed or contracted with Tom Baldwin to do the "job" for him. The uncontradicted evidence on this point is that this was a private contract between Bridges and Baldwin in which the defendant company did not participate in any way.

Baldwin made arrangements with deGraffenreid for the latter's help in carrying out his (Baldwin's) contract with Bridges. DeGraffenreid was to help Baldwin, when he (deGraffenreid) was not working for the company. Incidentally, Baldwin and deGraffenreid were working a five-day or 40-hour week, which under the then existing conditions was all of the time the men worked. Thus each had two days each week when they did not work for the company.

Charles Bridges lived at Langley, a small town in close proximity to the site of the dam. On the morning of August 6, 1939, his automobile remained at his home when he went to work, this for the reason that the old motor had been removed and the new or rebuilt motor had not been installed.

Tom Baldwin also lived at Langley and did not report for work on the 6th.

We will let Walt deGraffenreid tell what happened when he reported for work. We quote from his testimony:

"Q. You say you reported for work on August 6, 1939, that was the day that Buck Bassham was burned? A. That is right. Q. Did you go to work? A. No, the boss and Charlie Bridges met me, I would say, 30 feet from the machine shop, and told me to take the day off. And Charlie told me that the motor had

arrived for that car of his, and Tom Baldwin told me to come on over to Langley and help him install the motor. Q. That is the car you were working on when Buck Bassham was burned? A. Charlie Bridges' personal car. Q. Did Charlie Bridges employ you to do the work on the motor? A. No, Charlie knew nothing about it until Tom Baldwin told him to tell me to come on; that was an agreement between Tom Baldwin and I. Q. Had Baldwin asked you to help him install this new motor in Charlie Bridges' car? A. He had. Q. After you reported for duty and your boss told you to take the day off, what did you do? A. I went back to the office and checked my brass in, took my car out of the parking lot where employees parked their cars, and went back by the machine shop and picked up my personal tools, put them in my car and started to Langley. Q. What do you mean, your personal tools? A. My hand tools that I used, mechanical tools. Q. They belonged to you? A. Yes, sir, personal tools. Well, I started the motor and started on to Langley, and Buck Bassham came out and asked me where I was going, and I told him I was going over to Langley to do some work, and he asked if he could ride to Langley with me. And, of course, knowing him as I did, I told him he could. Well, I got to Langley and he didn't make any effort, or say anything of getting out of the car. Q. Where did you go when you got to Langley? A. Well, I went over to Tom Baldwin's home, and Tom was still in bed. I woke Tom up and told him I was ready to help him on the motor, and I went back to Charlie Bridges' home and went to work. Q. Did you take Baldwin with you? A. Baldwin came up later, after he got up and ate breakfast. Q. Was Bassham still in the car? A. He was still in the car. Q. Then what did you do? A. Well, I went to work on the motor, and in about 30 or 45 minutes Baldwin came on up to Bridges' home. Q. Where was Buck Bassham all this time? A. He was sitting in a lawn chair at the side of Charlie Bridges' home, watching me; I was installing some pins, and different parts that did not come with an exchange motor. Q. Did Buck Bassham then, or at any other time up to the time that he was burned, take any part in the work? A. No, he did not. He sat there

and talked to me and Baldwin, and ate his lunch about 9 o'clock, sitting there in the chair by Bridges' home. Q. Where did he get his lunch? A. He brought it with him, brought it with the intention of working for Massman. He had his lunch in a paper sack, and he got it out and ate it, offered me part of his lunch, about 9 o'clock. Q. Then Baldwin came over in about 45 minutes, you say? A. Well, Baldwin came over there, I would say, came over about 7 o'clock, or a few minutes after."

DeGraffenreid and Baldwin installed the reconditioned motor in Bridges' yard. When they were ready to start the motor they noticed the plugs were not in it. The old motor was at the Massman warehouse. They decided to get plugs from it for the new motor. Baldwin, using his car for the purpose, pushed the car (which was steered by Bridges) to the warehouse. DeGraffenreid and Bassham went to the warehouse in the former's car. The plugs from the old motor were placed in the new and then, as deGraffenreid relates:

". . . Baldwin and I turned Bridges' car around by hand, to give it a push. I got under the wheel of Bridges' car and Baldwin drove his car up to it to push it. We started the car. In the meantime I had got about a pint of gasoline in a little can, and poured about a third of it in the carburetor of Bridges' car, and set the other down by the garage, and I went and got in Bridges' car and Baldwin drove up there to give it a push, and just started the car in motion, and Bassham run out there and grabbed this can of gasoline and jumped on the running board and then up on the fender, and said, 'Let me prime the car for you.'

"Well, the car was in motion, and we had rolled anywhere between three and five hundred feet from the garage before I started to start it. It started and the motor run out of gas in the carburetor, and Bassham turned the can up to prime it and I noticed a flash, so I immediately pulled on the choke and cut the ignition off and stopped the car, and I noticed Bassham jump off, running in flames.

"I run out and caught Bassham and threw him down on the ground, tore

his shirt off of him, and put the fire out on his trousers.

"In the meantime, while this was all happening some more fellows come over, I don't know who they was, from near the mixing plant, to help extinguish these flames, but by the time they arrived I had the flames out."

On August 19, 1939, Bassham died of the injuries received.

Plaintiff's cause of action as asserted in his petition was predicated on the theory that deGraffenreid negligently turned on the ignition switch of the car while Bassham was pouring gasoline, and that the defendant company was responsible because deGraffenreid was working for it at the time. To escape the effect of the fellow-servant doctrine, plaintiff asserts that deGraffenreid was a superior servant or vice-principal under whom Bassham was working at the time, it being plaintiff's theory that Bassham was also working for the company.

The allegations of plaintiff's petition were traversed by a verified denial thus placing the question of deGraffenreid's employment and authority in issue with the burden of proof on the plaintiff. 12 O. S. 1941 § 286.

The defendant herein was not responsible for the alleged negligence of deGraffenreid under the doctrine of respondeat superior unless deGraffenreid was at the time working for the company and acting in the course of his employment. Holmboe v. Neale, 69 Okla. 183, 171 P. 334; Schmitt v. Kier, 111 Okla. 23, 238 P. 410; Fairmont Creamery Co. of Lawton v. Carsten, 175 Okla. 592, 55 P. 2d 757; Phillips Petroleum Co. v. Ward, 181 Okla. 462, 74 P. 2d 614; Spartan Aircraft Co. v. Jamison, 181 Okla. 645, 75 P. 2d 1096.

The testimony of deGraffenreid as to the arrangements under which he was working was corroborated by Bridges. Baldwin was not produced as a witness by either party. There is no direct contradiction of the testimony on the point. It is not inherently improbable.

The defendant invokes rule 10 of this court and requests that the plaintiff point out any proof in the record tending to show that deGraffenreid was working for it, which proof it asserts is entirely absent from the record.

In response to this demand plaintiff calls our attention to proof tending to indicate that Bridges sometimes used his car on company business. This does not prove the point. He calls our attention to proof showing that Bassham reported to his foreman for work on August 6th, was informed that the cement mixer was broken down, was told to inquire of Bridges to see if he could obtain work for the day, did inquire of Bridges and was directed by Bridges as a company foreman to help deGraffenreid on the car, which car was referred to by Bridges as a company car. That Bridges at the time of such direction pointed out deGraffenreid then sitting in a car a short distance away as the man Bassham was to help. Bridges denies such directions were given, but we must assume in support of the judgment that the jury believed they were.

The assumed fact that Bridges sometimes used his car on company business offers a plausible reason for assigning a company man on company time to work on the car. Assuming that Bridges had the authority to direct a company man to work on a car (a function that did not fall within the ordinary field of his supervision), we may accept the proof as sufficient to show that Bassham was working for the company. However, the fact that Bassham may have been employed by the defendant at the time was in no wise inconsistent with deGraffenreid working on the car to assist Baldwin in carrying out a private contract with Bridges.

Defendant's position is correct. There is no evidence in the record of sufficient probative force to support the view that deGraffenreid was acting in the course of employment as an employee of the defendant company. Since this theory inheres in the judgment under the issue as presented by the pleadings and determined by the trial court. the cause

must be returned to the trial court for a new trial.

It is proper to mention that plaintiff in his reply injected a new theory into the litigation, that the defendant company had breached its duty to furnish to deceased safe appliances, tools, and equipment and to provide a safe place to work. It is not clear from the pleading, the proof, or the briefs herein filed in what particular plaintiff thinks defendant was negligent in the matters indicated, and it does not appear that the verdict rested on this theory independent of plaintiff's assertion of defendant's legal responsibility under the doctrine of respondeat superior.

We shall not anticipate or attempt to decide in advance the questions that might be presented in connection with the theory indicated on a subsequent trial of the case.

Reversed and remanded for a new trial.

CORN, C.J., and OSBORN, WELCH, and HURST, JJ., concur. GIBSON, V.C. J., and RILEY, BAYLESS, and ARNOLD, JJ., dissent.